UNITED STATES DISTRICT COURT
NORTHERN DISTRICT OF GEORGIA

| | |
|---|---|
| JAMES HAMMETT,<br><br>               Plaintiff,<br><br>v.<br><br>Debt Resolution Direct, LLC d/b/a Debt Advisors of America Company,<br><br>               Defendants. | Case No.:<br><br>**COMPLAINT AND DEMAND FOR JURY TRIAL**<br><br>1. **CROA, 15 U.S.C. § 1679,** *et seq.* |

Plaintiff James Hammett ("Mr. Hammett" or "Plaintiff") alleges violations of the Credit Repair Organizations Act ("CROA"), 15 U.S.C. § 1679, *et seq.* against Debt Resolution Direct, LLC d/b/a Debt Advisors of America Company ("DAA" or "Defendant"):

## INTRODUCTION

1. Plaintiff's Complaint arises from violations of the Credit Repair Organizations Act by DAA.

## JURISDICTION AND VENUE

2. This Court has jurisdiction over this action pursuant to 28 U.S.C. § 1331, because Plaintiff alleges violation of the CROA, a federal law. 15 U.S.C. 1679g (CROA) (establishing civil liability).

1

3. Venue in the Northern District of Georgia is proper pursuant to 28 U.S.C. § 1391 because Defendant regularly transacts business within this District, is otherwise subject to personal jurisdiction in this District, and a substantial part of the events giving rise to Plaintiff's claims occurred in this District.

## PARTIES

4. Plaintiff incorporates herein by reference all of the above paragraphs of this Complaint as though fully set forth at length herein.

5. Plaintiff is a natural person who resides in Cobb County, Georgia

6. Plaintiff is a consumer as defined by the CROA, 15 U.S.C. §1679a(1).

7. Defendant is a credit repair organization ("CRO") as defined by both the CROA, 15 U.S.C. § 1697(a)(3), and Article 4 of the Georgia State criminal code, O.C.G.A. § 16-9-59(a)(2)(A), and a debt settlement company that offers "a form of debt consolidation without a loan" through a personalized "debt restructure program."[1]

8. For example, Defendant advertises the following service for individuals with a "total debt of $25,000" –

   a. A "monthly payment" of $408;

---

[1] Reduce your monthly payments today!, Debt Advisers of America, https://www.debtadvisorsofamerica.com/ (last visited Oct 3, 2022).

    b. A "total repayment" of $18,750;

    c. A "debt free in" estimate of 46 months;

    d. An "interest rate" of 0%; and

    e. "1-on-1 expert help."[2]

9. During all times pertinent to this Complaint, Defendant conducted business in the State of Georgia on a routine and systematic basis.

10. Defendant is headquartered at 6863 Friars Rd, Ste 101, San Diego, CA 92108-1266.

11. During all times pertinent to this Complaint, Defendant acted through its authorized agents, employees, officers, members, directors, heirs, successors, assigns, principals, trustees, sureties, subrogees, representatives, and/or insurers.

12. Any violations by Defendant were not in good faith, were knowing, negligent, willful, and/or intentional.

## FACTUAL ALLEGATIONS

13. Plaintiff incorporates herein by reference all of the above paragraphs of this Complaint as though fully set forth at length herein.

14. Congress enacted the CROA, in part, "to protect the public from

---

[2] Reduce your monthly payments today!, Debt Advisers of America, https://www.debtadvisorsofamerica.com/ (last visited Oct 3, 2022).

unfair or deceptive advertising and business practices by credit repair organizations." 15 U.S.C. § 1679(b)(2).

15. In so doing, Congress expressly found that "[c]ertain advertising and business practices of some companies engaged in the business of credit repair services have worked a financial hardship upon consumers, particularly those of limited economic means and who are inexperienced in credit matters." 15 U.S.C. § 1679(a)(2).

16. The CROA was enacted primarily for the benefit and protection of individual consumers who are experiencing "credit problems." *See* 15 U.S.C. § 1679(a)(1) ("…consumers who have experienced credit problems may seek assistance from credit repair organizations which offer to improve the credit standing of such consumers.").

17. At all times pertinent to this Complaint, Mr. Hammett was such a consumer. Under circumstances irrelevant to this action, at some point prior to December 2020 Mr. Hammett experienced financial hardship, falling behind on a myriad of debts which were impacting his credit score.

18. On or about December 9, 2020, Mr. Hammett, who was then a resident of the State of Arizona, received an unsolicited flyer in the mail from DAA, advertising help for credit issues.

19. Mr. Hammett called the number on the flyer and spoke to a representative of DAA regarding the possibility of DAA assisting Mr. Hammett with his debt and credit issues.

20. DAA advised Mr. Hammett that he could enroll a number of his debts into its program, at which point Mr. Hammett would make monthly payments, and that DAA would, in turn, use such funds for the purpose of assisting Mr. Hammett in resolving his obligation.

21. Mr. Hammett was expressly instructed by DAA that, if he signed up for the program, he should stop paying all of his creditors and only pay DAA.

22. DAA further informed Mr. Hammett that DAA's program included legal services provided by non-party Litigation Practice Group ("LPG"), a law firm which DAA represented as "Debt Advisers of America's attorneys" even though LPG and DAA are separate entities, which offered services including the deletion of all charge-off and late-payment notations from his credit report using the Fair Credit Reporting Act.

23. Mr. Hammett was led to believe that DAA's program, if it worked as advertised, would result in Mr. Hammett having the derogatory information and accounts appearing on his credit report resolved or otherwise removed, so that such accounts would no longer impact his credit in the manner they were.

24. Believing that, by signing up and paying for DAA's advertised services, he would have his accounts resolved and credit improved by paying DAA instead of his creditors, Mr. Hammett agreed to utilize DAA's services.

25. DAA's representative then introduced Mr. Hammett to a representative from LPG, explicitly representing to Mr. Hammett that LPG was DAA's partner and would provide the legal portion of the services offered through the program, including credit report review and removal of accounts reporting charge-offs or late payments status.

26. Mr. Hammett signed a retainer agreement with LPG, at the direction of DAA's representative, and set up automatic payments for the credit repair and debt relief program through a third-party payment processor identified as non-party Coastal Processing Company ("Coastal Processing").

27. Mr. Hammett entered into an agreement with DAA and began paying the demanded monthly payment of approximately $255 through Coastal Processing.

28. Sometime thereafter, LPG informed Mr. Hammett that it would start processing his payments rather than Coastal Processing.

29. Upon information and belief, Mr. Hammett's first payment made to DAA was an up-front, one-time fee of approximately $255 charged for services

DAA had not yet performed.

30. As Mr. Hammett continued making his monthly payments, DAA continued charging Mr. Hammett fees for services not yet performed.

31. DAA failed to clarify to Mr. Hammett the way in which his payments would be apportioned or what portions would go towards certain fees.

32. During this time, Mr. Hammett continued to call DAA regularly and speak to its representative, requesting updates on the progress.

33. While Mr. Hammett was led to believe that his payments were going towards actively resolving his debts or otherwise addressing his credit, DAA failed to perform the services that were represented, and Mr. Hammett received no benefit at as result of DAA's program.

34. In the Fall of 2021, Mr. Hammett moved to Cobb County, Georgia.

35. Mr. Hammett expressly informed DAA's representative of his move to Georgia via telephone.

36. DAA continued to accept Mr. Hammett's monthly payments and assured him that such payments were going towards the resolution of his debt and credit concerns when he called.

37. On March 11, 2021, Mr. Hammett received letters from LPG stating that, under the enrolled program, LPG had sent dispute letters to all three credit

bureaus to remove all unverified debt under the FCRA.

38. In March 2022, Mr. Hammett pulled his credit reports from all three major consumer reporting agencies and discovered that his credit report had declined substantially since beginning DAA's program. Specifically, prior to retaining DAA, Mr. Hammett's credit score had been approximately 672. As of March 2022, Mr. Hammett's credit scores were as follows:

   a. Equifax: 548

   b. Experian: 552

   c. Trans Union: 548

39. Mr. Hammett also discovered that neither DAA nor LPG, despite explicit representations to the contrary, had sent dispute letters to the consumer reporting agencies and that multiple accounts enrolled in DAA's program were still reporting as derogatory accounts having been charged off or with late payment notation.

40. In other words, during the time wherein Mr. Hammett was paying DAA for the express purpose of resolving his debts and improving his credit, Mr. Hammett's debts became massively delinquent, and his credit score dropped over 120 points.

41. Shocked, Mr. Hammett called all three of the consumer reporting

agencies and was informed by the same that they had never received any documents or disputes from DAA or any company associated with DAA.

42. Upon learning this, Mr. Hammett called DAA and spoke to the representative, demanding proof that any disputes had actually been sent. Neither DAA nor LPG could provide such proof.

43. Mr. Hammett paid thousands of dollars in monthly payments to DAA before cancelling his contract in or around March 2022, due to DAA's failure to provide any benefit to Mr. Hammett, much less the benefits that were represented to Mr. Hammett as forthcoming if he enrolled in DAA's program.

44. DAA's actions have caused Mr. Hammett substantial harm.

45. Mr. Hammett's credit score dropped over 120 points on average, causing third-party potential creditors to view him less favorably. Furthermore, the drop in credit score prevented Mr. Hammett from accessing $17,000 from his SBA Disaster Loan, taken out to assist his business during the COVID-19 pandemic.

46. Mr. Hammett is now in a serious financial predicament, being forced to consider filing for bankruptcy due to DAA's false representations and failure to provide the services promised.

47. All of this has caused Mr. Hammett enormous amounts of stress emotional and mental distress, including but not limited to stress, anxiety, mental

anguish, aggravation, sleeplessness, and headaches.

## COUNT I
### Violations of the CROA, 15 U.S.C. § 1679, *et seq.*

48. Plaintiff incorporates herein by reference all of the above paragraphs of this Complaint as though fully set forth herein at length.

49. Mr. Hammett is a "consumer" as defined by 15 U.S.C. § 1679a(1) of the CROA.

50. DAA is a "credit repair organization" as defined by § 1679a(3) of the CROA, as it is an entity which uses any instrumentality of interstate commerce or the mails to sell, provide, or perform any service, in return for the payment of money or other valuable consideration, for the express or implied purpose of improving a consumer's credit, credit history, or credit rating, or providing assistance to any consumer with regard to any activity or service for the purpose of improving a consumer's credit.

51. DAA is also a "credit repair organization" as defined by § O.C.G.A. § 16-9-59(a)(2)(A) of the Georgia State criminal code, as it is an entity which, with respect to the extension of credit to a buyer by others, sells, provides, or performs, or represents that [it] can or will sell, provide, or perform, in return for the payment of money or other valuable consideration the service of improving a buyer's credit

record, history, or rating or providing advice or assistance to a buyer with regard to the same.

52. DAA's program was presented to Mr. Hammett and consumers as having the implicit purpose of improving credit history, as if it worked properly, it would allow Mr. Hammett to pay down his debts and reestablish his credit. DAA's connecting Mr. Hammett with LPG further illustrates that it is a credit repair organization under the CROA.

53. DAA's actions as a CRO during all times after receiving notice that Mr. Hammett had moved to Georgia constitute a misdemeanor under Georgia State law, O.C.G.A. Section 16-9-59.

### *Violations of CROA § 1679b(a)*

54. The CROA, under 15 U.S.C. § 1679(a)(3) prohibits any person from "mak[ing] or us[ing] any untrue or misleading representation of the services of the credit repair organization." Additionally, under § 1679a(4), any person is prohibited from "engag[ing], directly or indirectly, in any act, practice, or course of business that constitutes or results in the commission of, or an attempt to commit, a fraud or deception of any person in connection with the offer or sale of the services of the credit repair organization."

55. DAA violated the above referenced provisions of the CROA through

the generally deceptive and misleading nature in which it held out its services to Mr. Hammett. DAA promised Mr. Hammett that its program and partnerships would result in all of Mr. Hammett's enrolled debts being addressed and resolved. However, DAA failed to meaningfully perform any of the services it represented it would perform.

56.    DAA further violated the above referenced provisions of the CROA through its misrepresentations and deceptions as to the nature of the fees that would be assessed in connection with the advertised services it offered. DAA suggested to Mr. Hammett that his payments would go towards resolving his obligations. However, DAA deceptively omitted the fact that there would be extensive charges for various fees and services that were not properly explained to Claimant, including fees charged by LPG and other monies simply pocketed by DAA for services not yet rendered. DAA's conduct was designed to convince Mr. Hammett that utilizing DAA's services would be beneficial, while failing to mention any information that would make Mr. Hammett rethink the appropriateness of DAA's program.

57.    DAA further violated the above referenced provisions of the CROA through it generally fraudulent and deceptive business model. Upon information and belief, DAA is part of a scheme whereby it seeks to enroll vulnerable

consumers in its programs based on incomplete and deceptive information absent the intent to provide the services as advertised. After a consumer has been convinced of the potential upsides of DAA's program, and upon further information and belief, DAA has the consumer sign a retainer with LPG for the supposed legal services to be performed, and then has the payment for the entire program processed through a third-party vendor, Coastal Processing. Upon information and belief, LPG and DAA share portions of the services charges without informing the consumer of the same. As such, DAA engages in a deceptive and unfair scheme designed to transfer a consumer's money to its own pockets before such consumer gets wise to the ineffective nature of DAA's services.

58. Finally, DAA violated the above referenced provisions of the CROA by engaging in activity which is illegal under state law. DAA's actions as a CRO during all times after receiving notice that Mr. Hammett had moved to Georgia constitute a misdemeanor under Article 4 of Georgia State law, which sets forth "Fraud and Related Offenses." Specifically, DAA violated O.C.G.A. Section 16-9-59, committing a misdemeanor as a result. Engagement in activity expressly defined as an offense "related" to "fraud" under state law constitutes "engag[ment], directly or indirectly, in any act, practice, or course of business that constitutes or results in the commission of, or an attempt to commit, a fraud or

deception of any person in connection with the offer or sale of the services of the credit repair organization." *See* § 1679a(4). Thus, DAA's violation of Georgia state law is a per se violation of the CROA.

### *Violations of CROA § 1679b(b)*

59. The CROA, under § 1679b(b), explicitly states that "[n]o credit repair organization may charge or receive any money or other valuable consideration for the performance of any service which the credit repair organization has agreed to perform for any consumer before such services is fully performed."

60. DAA violated § 1679b(b) by charging and receiving money from Mr. Hammett in exchange for the performance of services before such services were fully performed. DAA charged Mr. Hammett consideration on an upfront basis before any services were performed, in plain violation of § 1679b(b) and attempted to hide such charge as a fee for legal services to LPG by having all payments process by a third-party vendor, Coastal Processing, and by splitting such payments with LPG. Furthermore, throughout the life of their dealings, DAA engaged in this scheme on a monthly basis, charging Mr. Hammett a flat-fee or otherwise causing undisclosed services fees to be created for services before such services were fully performed.

61. Mr. Hammett paid DAA thousands of dollars in fees despite DAA

failing to perform the services and achieve the represented results that would have justified its collection of such payments and fees.

### *Violations of CROA §§ 1679c, 1679d & 1679e*

62.     The CROA, under § 1679c, outlines various disclosures that CROs must provide prior to entering into agreements with consumers such as Mr. Hammett.

63.     Further, § 1679d(a), expressly requires a CRO to enter into a written and dated contract before providing or purporting to provide credit repair services.

64.     Further, § 1679d(b) outlines various requirements for any contracts between CROs and their customers, including a written description of "the terms and conditions of payment, including the total amount of all payments to be made by the consumer to the credit repair organization or to any other person" and "a full and detailed description of the services to be performed by the credit repair organization for the consumer" and "all guarantees of performance; and an estimate of the date by which the performance of the services (to be performed by the credit repair organization or any other person) will be complete" and "the credit repair organization's name and principal business address" and finally "a conspicuous statement, in bold face type, in immediate proximity to the space reserved for the consumer's signature on the contract, which reads as follows:

'You may cancel this contract without penalty or obligation at any time before midnight on the 3rd business day after the date on which you signed the contract. See attached notice of cancelation form.'"

65. Further, § 1679e requires copies of the required notice of cancellation to be provided to consumers.

66. DAA failed completely to comply with the requirements under § 1679d(b). Specifically, DAA

    a. Failed to enter into a written contract which included the total amount of payments to be made to DAA or "any other person" (such as LPG);

    b. Failed to include a full description of the services to be performed, including all guarantees of performance and an estimate of the time in which the services would be performed by either DAA or "any other person" (such as LPG); and

    c. Failed to include its organizational name and principal place of business address in the required written contract;

67. Further, DAA attempted to escape the requirements under §§ 1679c, 1679d & 1679e by failing to provide Mr. Hammett with a written contract for its advertised services, and instead having Mr. Hammett sign a retainer agreement with LPG (who it represented to Mr. Hammett as DAA's attorneys), and by having

all payments routed through a third-party processing vendor, Coastal Processing.

68. DAA entered into an illegal oral agreement with Mr. Hammett to provide services as a CRO and failed completely to provide the required disclosures under §§ 1679c, 1679d & 1679e.

69. Due to DAA's noncompliance with the above referenced CROA provisions, its agreement with Mr. Hammett is void and unenforceable under 15 U.S.C. § 1679f(c).

### *DAA's Liability*

70. DAA's violations of the CROA render it liable to Mr. Hammett for actual damages, punitive damages, and an award of costs and reasonable attorneys fees.

### **PRAYER FOR RELIEF**

WHEREFORE, Plaintiff respectfully requests that this Honorable Court enter judgment against Defendant for the following:

(a) A declaration that the practices complaint of herein are unlawful and violative of the CROA;

(b) An award of actual damages to be determined at trial, pursuant to 15 U.S.C. § 1679g(a)(1)(A);

(c) An award of punitive damages, as allowed by the Court pursuant to 15 U.S.C. § 1679g(a)(2)(A),

(d)     Costs and reasonable attorneys' fees pursuant to 15 U.S.C. § 1679g(a)(3); and

(e)     Such other and further relief as this Honorable Court may deem just and proper, including any applicable pre-judgment and post-judgment interest, and/or declaratory relief.

## JURY DEMAND

Plaintiff hereby demands jury trial on all issues so triable.

RESPECTFULLY SUBMITTED this 25th day of October 2022,

>*/s/Jenna Dakroub*
>Jenna Dakroub GA: 385021
>**Price Law Group, APC**
>8245 N. 85th Way
>Scottsdale, AZ 85258
>E: jenna@pricelawgroup.com
>T: (818) 600-5513
>F: (818) 600-5513
>*Attorney for Plaintiff,*
>*James Hammett*